# EXHIBIT A

**IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY PENNSYLVANIA**

MAXWELL OTU,
*Plaintiff.*

v.

FLUTTER ENTERTAINMENT, PLC; FANDUEL GROUP PARENT LLC; BETFAIR INTERACTIVE US, LLC; FANDUEL PA LLC; and FANDUEL INC.,
*Defendants.*

July Term 2026

Case No.:________

**Jury Trial Demanded**

**NOTICE TO DEFEND**

You have been sued in Court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the Court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the Court without further notice for any money claimed in the complaint or for any claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

**LAWYER REFERRAL SERVICE**

**FRONT AND LEMON STREETS**

**MEDIA, PA 19063**

**610-566-6625**

**IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY PENNSYLVANIA**

| | |
|---|---|
| MAXWELL OTU,<br>*Plaintiff.*<br><br>v.<br><br>FLUTTER ENTERTAINMENT, PLC; FANDUEL GROUP PARENT LLC; BETFAIR INTERACTIVE US, LLC; FANDUEL PA LLC; and FANDUEL INC.,<br>*Defendants.* | July Term 2026<br><br>Case No.:________<br><br>**Jury Trial Demanded** |

Plaintiff MAXWELL OTU by and through his attorneys, Aylstock, Witkin, Kreis, & Overholtz, PLC, hereby brings this action against Flutter Entertainment PLC, FanDuel Group Parent LLC, Betfair Interactive US LLC, FanDuel PA LLC, and FanDuel Inc. (collectively, “FanDuel,” and “Defendants”). Plaintiff alleges the following upon personal knowledge as to Plaintiff’s own acts and experiences and upon information and belief, including investigation conducted by Plaintiffs’ attorneys as to all other matters:

## NATURE OF THE ACTION

1. Sports gambling mobile applications (“apps”) have recently exploded in popularity. Their dangerously addictive design exploits users’ vulnerabilities through constant accessibility on smartphones, turning a simple tap into an unlimited gateway for compulsive betting. FanDuel designed and developed some of the most popular sports betting apps. Their gambling apps track every user interaction including wagers placed, time spent on the app, and even moments of hesitation to create hyper-personalized algorithms. Utilizing this data, they bombard gamblers, including gamblers that they know or should know are problem gamblers, with targeted notifications and advertisements precisely when they’re most susceptible, like late at night or after

a big loss. The apps deploy targeted promotions like "risk-free bets" and deposit bonuses that mask losses while encouraging larger wagers. They utilize "push notifications" that direct the user to revisit the app after they have been away or inactive. They additionally offer exclusive "VIP" concierge programs offering lavish perks, private account managers, and accelerated payouts to make frequent and high-volume betters feel valued and indispensable. FanDuel also offers casino gaming within their sports gambling apps, encouraging users to utilize the casino games as "instantaneous" gambling through methods such as virtual slots. As the company behind these sophisticated apps, FanDuel knowingly refuses to implement any reasonable safeguards and, in fact, intentionally designs their sports gambling platforms to addict. Consequently, their customers face massive monetary losses, bankruptcy, career loss, physical harm, and mental anguish, such as depression and even suicide when they fall into gambling addiction.

## PARTIES

2. Plaintiff MAXWELL OTU is a natural person and resident of Newtown Square, Pennsylvania (Delaware County) where he suffers from gambling addiction disorder and gambling-related anxiety and depression.

3. Defendant Flutter Entertainment plc is a public limited company organized under the laws of Ireland. Flutter maintains a registered office in Dublin, Ireland, and its principal place of business in New York, New York. Flutter is the ultimate parent of the FanDuel-branded entities identified herein. Based on information and belief, Flutter exercises control over the business operations of its FanDuel subsidiaries, including the development, distribution, and operation of the FanDuel Sportsbook App offered to consumers in this Commonwealth.

4. Defendant FanDuel Group Parent LLC is a limited liability company organized under the laws of Delaware with its principal place of business in New York, New York. Based on

information and belief, FanDuel Group Parent LLC conducts a portion of FanDuel's Pennsylvania business, including activities related to the operation of FanDuel's online sportsbook platform (the “FanDuel Sportsbook App”). At all relevant times, FanDuel Group Parent LLC has been registered to do business in Pennsylvania.

5. Defendant Betfair Interactive US LLC, which conducts business under the name FanDuel Sportsbook, is a limited liability company organized under the laws of Delaware with its principal place of business in Los Angeles, California. Based on information and belief, Betfair Interactive US LLC conducts a portion of FanDuel's Pennsylvania business, including activities related to the operation of the FanDuel Sportsbook App. Betfair Interactive US LLC has been registered to do business in Pennsylvania at all times relevant to this action.

6. Defendant FanDuel PA LLC is a limited liability company organized under the laws of Pennsylvania with its principal offices in Pennsylvania. Based on information and belief, FanDuel PA LLC conducts a portion of FanDuel's Pennsylvania business, including activities related to the operation of the FanDuel Sportsbook App. At all relevant times FanDuel PA LLC has been registered to do business in Pennsylvania.

7. Defendant FanDuel Inc. is a Delaware corporation with its principal place of business in New York, New York. FanDuel Inc. has been registered to do business in Pennsylvania at all times relevant to this action. Based on information and belief, FanDuel Inc. conducts a portion of FanDuel's Pennsylvania business, including activities related to the operation of the FanDuel Sportsbook App.

8. Defendants Flutter Entertainment plc, FanDuel Group Parent LLC, Betfair Interactive US LLC, FanDuel PA LLC, and FanDuel Inc. are referred to collectively herein as “FanDuel.”

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over the instant civil matter pursuant to 42 Pa.C.S.A. § 931, which provides the Courts of Common Pleas with jurisdiction over this action, as the law vests the Courts of Common Pleas with unlimited jurisdiction over all actions and proceeding cognizable by law or usage in the courts of common pleas in the State of Pennsylvania.

10. This Court has personal jurisdiction over Defendants FanDuel Group Parent LLC, Betfair Interactive US LLC, and FanDuel Inc., pursuant to 42 Pa.C.S.A. § 5301(a) as each of these Defendants as registered as a foreign entity in the Commonwealth of Pennsylvania, and in registering, has consented to the exercise of personal jurisdiction of the Courts of this Commonwealth.

11. This Court has personal jurisdiction over Defendant FanDuel PA LLC pursuant to 42 Pa.C.S.A. § 5301(a) as FanDuel PA LLC is incorporated under the laws of Pennsylvania and is therefore subject to the personal jurisdiction of this Commonwealth.

12. This Court has personal jurisdiction over Flutter Entertainment plc pursuant to 42 Pa.C.S.A. § 5322. Based on information and belief, Flutter directs and controls the business strategy, product design, and technology development of the FanDuel Sportsbook App offered to consumers in this Commonwealth. Flutter's own Fourth Quarter and Full Year 2025 Financial Results asserted that, through the FanDuel sports-betting strategy, "[they] are leveraging [their] scale, proprietary technology, and data advantages to deliver differentiated experiences competitors cannot easily replace. [Flutter] is also continuing to invest in making every interaction – from login and payments to live betting and cash out -faster, simpler, and more reliable . . ." and Flutter is also "enhancing how customers," including those in Pennsylvania, "feel recognized and

rewarded, with more engaging reward experiences . . ."[1] Based on information and belief, the FanDuel entities operating in Pennsylvania act as Flutter's agents in executing the product and business strategy that Flutter directs. Flutter's direction of these acts and omissions outside this Commonwealth caused tortious injury within this Commonwealth, and Flutter regularly does and solicits business in this Commonwealth.

13. Venue is proper in Delaware County pursuant to Penn. R. Civ. P. 1006(a)(1)-(3) and 2179(a)(2)-(4).

## STATEMENT OF FACTS

### I. Online Sports Gambling and the Industry Model

#### *A. The Growth of Online Sports Gambling*

14. The United States has experienced an unprecedented expansion of online sports betting and mobile gambling over the past six years. Following the Supreme Court's decision in *Murphy v. NCAA*, 584 U.S. 453 (2018), which opened the door for state-by-state legalization of sports betting, thirty-nine states and the District of Columbia have legalized sports betting in some form. An explosion in online sports gambling followed, with today's current industry landscape driven by two dominant players: DraftKings, and Defendant FanDuel.

15. In an industry, such as "[t]he global gambling industry," where the market, "is rapidly expanding, with net losses by consumers projected to reach nearly US $700 billion by 2028," competition for attention and capital is fierce.[2]

---

[1] Letter from Peter Jackson, Chief Exec. Officer, Flutter Entm't plc, to Shareholders 6 (Feb. 26, 2026), *in* Flutter Entm't plc, Fourth Quarter and Full Year 2025 Earnings Release, https://flutter.com/media/hdshhrmb/q4-2025-earnings-release.pdf (last visited Mar. 31, 2026).

[2] Heather Wardle et al., *The Lancet Public Health Commission on Gambling*, 9 Lancet Pub. Health e950, e950 (2024), https://doi.org/10.1016/S2468-2667(24)00167-1 (last visited Mar. 22, 2026) (citing Pekka Sulkunen et al., Setting Limits: Gambling, Science and Public Policy (2019); Gambling Research Exchange Ontario, Proportion of Revenue from Problem Gambling (2019)).

16. Thus, it follows that this industry expansion, "is fuelled [sic] by the rise of online gambling, widespread accessibility of gambling opportunities through mobile phones, increased legalisation [sic], and the introduction of commercial gambling to new areas" where consumers have instantaneous and around-the-clock access to gambling and minimum barriers exist between their daily lives and their gambling.[3]

17. According to William C. Miller, Jr., President and CEO of the American Gaming Association, "[p]ropelled by another year of strong organic growth in existing online markets for both sports betting and iGaming," during the year 2024, "the commercial casino sector enjoyed a third consecutive record year with gaming revenue accelerating by 7.5 percent to $72 billion."[4] "The unprecedented success," as Mr. Miller sees it, "comes as more Americans than ever before have access to, and allocate their entertainment budgets to, the legal, regulated gaming market."[5] This has followed naturally from more users increasingly gambling on their phone via apps that allow users to wager from any location at any hour.[6]

18. Together, FanDuel and DraftKings dominate the marketplace for online gambling, generating a majority of online sports gambling revenue, resulting in a functional duopoly.[7][8]

---

[3] *Id.* at e950.

[4] Am. Gaming Ass'n, *State of the States 2025: The AGA Analysis of the Commercial Casino Industry* 2 (May 2025), https://www.americangaming.org/wp-content/uploads/2025/05/AGA-State-of-the-States-2025.pdf (last visited Mar. 25, 2026).

[5] *Id.* at 2.

[6] Statista Digital Mkt. Insights, *Market Size of the Online Gambling Industry in the United States from 2017 to 2023, with a Forecast Until 2028*, Statista (Mar. 11, 2024), https://www.statista.com/forecasts/1318601/online-gambling-market-size-us (last visited Mar. 24, 2026).

[7] Matt Mariani, *Turning the Page on a Record 2024 for US Sports Betting*, Legal Sports Rep. (June 13, 2025), https://www.legalsportsreport.com/218449/2024-us-sports-betting-revenue/ (last visited Mar. 24, 2026) ("FanDuel and DraftKings remain the overwhelming market leaders, together accounting for more than 65% of the industry's output nationwide.")

[8] Flutter Entertainment plc, Annual Report (Form 10-K) at 1 (Mar. 4, 2025) ("Flutter is the world's largest leading online sports betting and iGaming operator based of revenue.").

*B. How the Industry Profits Off of User Losses and Addictive Gambling*

19. Defendants' businesses are dependent on customer losses. The more money a customer loses, the more revenue Defendants generate. This is not incidental to the business model; it is the business model.

20. Flutter's 10-K filing for the fiscal year 2025 states that the United States "is our fastest growing and our largest region, constituting $6,967 million (or 43%) of our revenue for fiscal 2025." [9] This follows as Flutter, according to their filings, "is the world's leading online sports betting and iGaming operator based on revenue."[10]

21. Flutter confirms the company "spent 3,678 million in sales and marketing . . ." for fiscal 2025 "to ensure that [they] have high levels of brand visibility . . ."[11]

22. Additionally, Flutter is explicit in that it "seek[s] to expand the Group's player base and grow player value through product innovation and efficient player spend."[12]

23. The goal, as Flutter's filings state, is to "[w]in in the U.S. by (i) extending FanDuel Sportsbook's lead as the primary sportsbook in the U.S. . . ."[13]

*C. The Fundamental Conflict: Profitability and User Well-Being*

24. The *Lancet Public Health* Commission on Gambling published findings in October of 2024 which argued that, using their power across various domains of public life, gambling companies push to frame gambling as beneficial to society, whereas the harms incurred are more

---

[9] Flutter Entertainment PLC, Annual Report (Form 10-K), at 3, (Feb. 26, 2026), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001635327/000163532726000005/flut-20251231.htm (last visited Jun. 26, 2026)
[10] *Id.* at 51
[11] *Id.* at 5.
[12] *Id.* at 52.
[13] *Id.* at 51.

so blamed on poor user choices than inherent negative qualities of gambling.[14] This aim, directed toward protecting industry perception, stifles discussions on the negative impacts of gambling and reveals the fundamental conflict between Defendants' business success and the well-being of their users.

25. The fact is that sports betting apps are different than any other type of gambling. Defendants' sports betting apps utilize addictive technology and features, such as "push" notifications, targeted advertisements, and personalized bonus incentives to continuously draw users back to the app.

*D. Problematic Gamblers Drive Revenue*

26. In sports gambling, a small minority of gamblers drive the majority of profitability. It is therefore expected that sports gambling operators' business models are structurally focused on this subset of individuals.[15] Denoted as "Problem Gamblers," one investigation, conducted by Gemini Research, Inc. of Northampton, Massachusetts and led by Dr. Rachel A. Volberg, President of Gemini Research and a Research Professor at the University of Massachusetts Amherst's School of Public Health, analyzed the post-legalization period of sports gambling in Connecticut.[16] The study found that less than 2% of Connecticut residents, considered to be "Problem Gamblers" (the percentage of Connecticut residents estimated to have a gambling problem), were responsible for 51% of the sports betting revenue in Connecticut.[17] These findings not only demonstrate that a

[14] Wardle et al., 9 Lancet Pub. Health at e964.
[15] *Id.* at e958.
[16] Gemini Research, *Impacts of Legalized Gambling in Connecticut* (Conn. Dep't of Mental Health & Addiction Servs. Jan. 2024), https://portal.ct.gov/-/media/dmhas/publications/2023-ct-final-report-jan312024.pdf (last visited Mar. 22, 2026).
[17] *Id.*

small minority of problematic gamblers drive Defendants' profits: they evidence that Defendants' profitability is a function of the most addicted, problem users.

## II. The Science Behind Addiction and Gambling Disorder

### *A. The Neurological Mechanisms Driving Bets*

27. A 2023 review article synthesizing neuroscience and behavioral psychology literature explains how modern gambling products are engineered to exploit the human brain.[18] One of the key findings is that, "[c]ollectively, the data suggest that inconsistent reward delivery in models of gambling may represent a special case of a broader phenomenon: i.e., variability (provided it is random) may be crucial for development of sensitization to both drug- and non-drug rewards."[19] The authors further assert that "multiple sources of variability exist and operate concurrently in modern digital products," including gambling, and that ultimately, "these overlapping sources of variability will amplify the addictive potential of these products via incentive sensitization."[20] Notably, modern digital gambling products layer multiple concurrent sources of this engineered variability – variable payout size, bonus features, temporal variability in spin duration, and near-miss mechanics, to drive "perpetual escalation ('hyper-learning')" in dopaminergic signaling analogous to that produced by addictive drugs.[21] Two moderating factors amplify this process: the time course and resolution of uncertainty, and the frequency of exposure, as "both variability and frequency likely contribute to the addictive potential of a non-drug

---

[18] Luke Clark & Martin Zack, *Engineered Highs: Reward Variability and Frequency as Potential Prerequisites of Behavioural Addiction*, 140 Addictive Behavs. 107626 (2023), https://doi.org/10.1016/j.addbeh.2023.107626 (last visited Mar. 22, 2026).
[19] *Id.* at 2.
[20] *Id.* at 2.
[21] *Id.* at 2-3.

reinforcer."[22] The authors conclude that digital technology "has permitted engineering of reinforcers with addictive potential that, delivered under natural conditions, would likely never become addictive."[23]

*B. Mobile Gambling Platforms Intensify Addictive Potential*

28. Mobile gambling platforms intensify the addictive properties of gambling in several independent and compounding ways. First, 24/7 access from any location eliminates the need to travel to a physical gambling venue. Second, the absence of a social environment removes the social inhibitions and shame responses that moderate in-person gambling. Third, the speed of mobile wagering — a bet can be placed in under five seconds — compresses the interval between impulse and action below the threshold at which rational deliberation can intervene. Fourth, "push" notifications, bonus alerts, and in-app badges create a persistent ambient presence in the user's daily life, inviting re-engagement at moments of boredom, stress, financial anxiety, or emotional vulnerability. Defendants utilize the combination of advanced technology and artificial intelligence paired with the tracking of personalized user data to intentionally addict users and continuously lure them back to their sports gambling apps.

29. As a result of constant access through ease-of-use Apps and the ability to bet on a Smartphone, Pennsylvania has seen a crisis emerge in the State. By just one example, though November 2025, the State of Pennsylvania's gambling hotline had already received more than twice as many calls for the year than in the year 2020, with the volume of calls topping a previous record set in 2023.[24] And according to *Philadelphia Today*, between the years 2021 and 2025,

---

[22] *Id.* at 5.
[23] *Id.*
[24] Isaac Avilucea, *Pennsylvania's Problem Gambling Hotline Calls Soar in 2025*, Axios Phila. (Dec. 17, 2025), https://www.axios.com/local/philadelphia/2025/12/17/pennsylvania-problem-gambling-hotline-calls-soar-in-2025 (last visited Mar. 31, 2026).

"calls to the help hotline increased by 40% . . ."[25] These increases are not arbitrary, but are a direct and proximate result of Defendants' online and mobile sportsbook apps intensifying addiction potential for users.

### III. Defendants' Knowledge of Addictive Design

#### *A. Defendants' Knowledge of Problem Gambling Patterns*

30. Flutter Entertainment, FanDuel's parent company, operates behavioral monitoring systems across its global platform.[26] Flutter's CEO Peter Jackson acknowledged in 2018, following a $2.8 million fine imposed by the U.K. Gambling Commission for failing to intervene when a customer exhibited problem gambling warning signs, that the company had a "responsibility to do so when [its] customers show signs of problem gambling."[27] This corporate acknowledgment of a duty to intervene, made publicly by Flutter's own CEO, establishes that Flutter/FanDuel possessed both the data capability to identify problem gambling patterns and the corporate knowledge that intervention was required.

31. Defendants have full visibility into users' concerning betting patterns and then push the users to gamble further through targeted advertising, personalized "bonus" incentives, and "push" notifications as discussed and explained above. Defendants' behavior preys on addicted

---

[25] Saleen Martin, *Youth Gambling Addiction Surges Amid Sports Betting Boom*, Phila. Today (Mar. 27, 2026), https://nationaltoday.com/us/pa/philadelphia/news/2026/03/27/youth-gambling-addiction-surges-amid-sports-betting-boom/ (last visited Mar. 31, 2026).

[26] *Inside Responsible Gaming: How The Flutter Edge Is Helping Customers Play Well Across the World*, Flutter Ent. (Nov. 20, 2025), https://flutter.com/news-media/blogs/inside-responsible-gaming-how-the-flutter-edge-is-helping-customers-play-well-across-the-world/ (last visited Mar. 25, 2026).

[27] *Online-Gambling Giants Conquer U.S. with Tactics Deemed Too Tough for Britain*, Reuters (July 3, 2024), https://www.cnbc.com/2024/07/03/online-gambling-giants-conquer-us-with-tactics-deemed-too-tough-for-britain.html (last visited Mar. 25, 2026); Flutter Ent., *Statement on Gambling Commission Regulatory Settlement* (Oct. 16, 2018), https://flutter.com/news-and-insights/press-releases/statement-on-gambling-commission-regulatory-settlement/ (last visited Mar. 25, 2026).

gamblers, as Defendants can predict when users will escalate into dangerous addictive gambling and intentionally target users when this happens.

## IV. The Deliberate Persuasive Design Architecture

### *A. Variable Reward Mechanisms*

#### *i. Near Miss Engineering*

32. In a landmark 2009 study published in *Neuron*, Dr. Luke Clark and colleagues at the University of Cambridge's Behavioural and Clinical Neuroscience Institute used functional magnetic resonance imaging (fMRI) to demonstrate that near-miss gambling outcomes activate win-related brain circuitry in the ventral striatum and anterior insula despite delivering no monetary reward, and that near-miss events measurably increased participants' reported desire and motivation to continue gambling.[28] The study established that near-miss outcomes are not neutral perceptual events but are actively processed by the brain's reward system in a manner that reinforces continued play independent of the absence of any actual reward.

33. Chase and Clark extended this research in a 2010 fMRI study published in *The Journal of Neuroscience*, scanning 20 regular gamblers of varying severity. The study found that gambling severity, measured using the validated South Oaks Gambling Screen, predicted the strength of dopaminergic midbrain activation in response to near-miss outcomes: the more severe the gambling disorder, the more strongly the midbrain fired in response to a near-miss, approaching the level of response to an actual monetary win.[29]

---

[28] Luke Clark et al., *Gambling Near-Misses Enhance Motivation to Gamble and Recruit Win-Related Brain Circuitry*, 61 Neuron 481 (2009), https://pmc.ncbi.nlm.nih.gov/articles/PMC2658737/ (last visited Mar. 25, 2026).

[29] Henry W. Chase & Luke Clark, *Gambling Severity Predicts Midbrain Response to Near-Miss Outcomes*, 30 J. Neuroscience 6180 (2010), https://www.jneurosci.org/content/30/18/6180 (last visited Mar. 25, 2026).

*B. Loss Chasing Features: Frictionless Re-Entry and Asymmetric Withdrawal Barriers*

34. A 2025 peer-reviewed study published in *Addiction* by Dr. Philip Newall of the University of Bristol School of Psychological Science catalogued in granular detail the specific "sludge" and "dark pattern" mechanisms deployed by online gambling platforms to asymmetrically impede exit while facilitating deposits. The study documented that: (a) gambling websites process deposits instantly while imposing delays of up to several days on withdrawals; (b) during withdrawal delays, platforms display prominent buttons prompting gamblers to reverse the withdrawal; (c) deposit pages are accessible via fewer clicks from the homepage than corresponding withdrawal pages, a deliberately engineered friction asymmetry; (d) 70% of audited gambling websites suggested in-game bet sizes greater than the minimum allowed; and (e) 60% of platforms had reality-check tools defaulted to the maximum allowed delay of four hours, the least protective configuration, rather than shorter intervals.[30] Each of these design choices is individually documentable as an affirmative product design decision by Defendants to maximize the difficulty of exit.

*C. Personalized Algorithms*

35. A 2025 peer-reviewed study published in *Behavioral Sciences* (PMC/MDPI) analyzed behavioral data from an online gambling platform at two time points (late 2016 and spring 2021) and found that patterns consistent with AI-driven personalization were associated with increases in betting persistence, risk-taking, and tendency to retain funds on-platform rather than withdraw.[31] The study concluded that AI-driven engagement algorithms "co-create behavioral

[30] Philip Newall, *Sludge, Dark Patterns and Dark Nudges: A Taxonomy of Online Gambling Platforms' Deceptive Design Features*, 120 Addiction 1916 (2025), https://pmc.ncbi.nlm.nih.gov/articles/PMC12426356/ (last visited Mar. 25, 2026).
[31] Niklas Kolomaznik, Ewa Oborska & Dragoș-Marian Iordache, *AI Personalization and Its Influence on Online Gamblers' Behavior*, 15 Behav. Sci., art. 779 (2025), https://doi.org/10.3390/bs15060779 (last visited Mar. 25, 2026).

risks" and that "algorithms must not be designed to take advantage of players' impulsivity or cognitive biases. In other words, the AI should not monetize moments of temporary loss of self-control."[32] Defendants operate sophisticated AI-powered engagement platforms that, on information and belief, employ the precise personalization mechanisms the study identifies as risk-generating.

*D. VIP Loyalty Programs: Targeting and Escalating Engagement of High-Loss Users*

36. A 2017 evidence review by Dr. Michael Wohl, commissioned by the independent, non-industry Gambling Research Exchange Ontario (GREO), concluded that disordered gamblers are over-represented in gambling loyalty programs relative to the general gambling population, and that gambling loyalty programs that reward volume of play uniquely exacerbate harm in users who cannot control their gambling behavior, unlike loyalty programs in other consumer industries.[33] The report identified that the industry uses "special treatment for gamblers to soften the blow of gambling losses, making the gambler feel like a very important person (VIP)" as a retention mechanism that specifically rewards the behaviors most pathognomonic of gambling disorder: frequency, deposit volume, and loss escalation.[34]

37. Defendants utilize "VIP" managers to offer personalized attention to high-volume gamblers. The "VIP" managers offer concierge services, such as free tickets to professional sporting events, often including suite access to entice users to attend. Additionally, "VIP"

---

[32] *Id.*

[33] Michael J.A. Wohl, *Loyalty Programs in the Gambling Industry*, GREO Evidence Exchange Report (2017), https://www.greo.ca/Modules/EvidenceCentre/files/Wohl%20(2017)%20Loyalty%20programs%20in%20the%20gambling%20industry.pdf (last visited Mar. 25, 2026).

[34] *Id.*

managers offer gambling-based incentives for users that attend their events, including promises of "bonus" bets loaded to the users' account in exchange for their attendance.

38. The "VIP" managers hired and managed by Defendants are directly available to users, including via text and phone call access where they can continuously reach out and contact users. The "VIP" managers act as an extension of the apps, offering real-time betting incentives, further luring high-volume users into addictive and excessive gambling patterns.

*E. Removal of Natural Stopping Cues*

39. Professor Natasha Dow Schüll of MIT's Program in Science, Technology, and Society conducted fifteen years of ethnographic field research in Las Vegas, published as *Addiction by Design: Machine Gambling in Las Vegas* (Princeton University Press, 2012). Schüll documented that gambling machines are deliberately engineered to induce a dissociative state she calls "the machine zone" — a psychological condition in which time, space, and external social awareness dissolve and players gamble "not to win but simply to keep playing, for as long as possible."[35] The design features producing and maintaining this state include: removal of clocks and external time cues, elimination of natural pauses between bets, high-speed continuous play, and seamless re-deposit flows. Schüll documented these as reflecting "the strategic calculations behind game algorithms and machine ergonomics" designed expressly to maximize "time on device." Defendants have transposed these design principles into their mobile gambling applications, as their applications allow for instantaneous betting with instant deposit mechanisms.

*F. Predatory Bonus Structure*

[35] Natasha Dow Schüll, Addiction by Design: Machine Gambling in Las Vegas (Princeton Univ. Press 2012), https://press.princeton.edu/books/paperback/9780691278285/addiction-by-design.

40. Defendants deployed "risk-free bet," "free bet," and equivalent promotional language as primary customer acquisition tools from the time of their respective state market launches through at least early 2023. Under these promotions, a user who lost their first bet received not cash but non-withdrawable "bonus" credits subject to complex wagering requirements requiring the user to continue gambling multiple times before the credit's value could be withdrawn as cash. "Risk-free" was materially false and misleading: the user's principal was indisputably at risk, was in fact lost, and could be recovered only by continued gambling. In March 2023, the American Gaming Association ("AGA"), of which FanDuel was then a member, formally amended its Responsible Marketing Code to ban all use of "risk-free" in advertising, acknowledging that prior promotional language was deceptive.[36] Defendants had continued to use this language while the AGA's own code was being revised, with knowledge that regulators in Ohio and Massachusetts had already taken enforcement action against these promotions, and knowing gambling advertising regulations that specifically outlawed the offer of "risk free" promotions (and promotions using similar language) were being promulgated.

*G. Microbets*

41. An additional addictive feature of Defendants' online sports gambling apps is the promotion of "microbets." Microbets are in-game wagers that allow for betting on live, hyper-specific events, which often have nothing to do with the overall outcome of the sporting event.

[36] Am. Gaming Ass'n, *New Updates to AGA Responsible Marketing Code Prohibit 'Risk Free'* (Mar. 2023), https://www.americangaming.org/new-updates-to-aga-responsible-marketing-code-for-sports-wagering-prohibit-risk-free-enhance-college-aged-protections/ (last visited Mar. 25, 2026); *see also Wagers and Warnings*, ABA Judges' J., Fall 2024, https://www.americanbar.org/groups/judicial/resources/judges-journal/2024-fall/wagers-warnings-state-sports-betting-advertisements/ (last visited Mar. 25, 2026).

Some examples of microbets are allowing bets on the outcome of the next baseball pitch or whether the next pass will be completed in a football game.

42. These microbets allow gamblers to continuously place bets during a sporting event and provide a constant reward/loss cycle that can result in a series of dopamine boosts. These are designed to further draw the user into placing these constant bets without having to wait on the ultimate outcome of a game. Micro-betting has been continuously linked to severe problem gambling and impulsivity.[37]

**V. Suppression of Harm-Reducing Measures**

43. A July 2024 Reuters investigation, based on corporate filings, company statements, testimonies to U.K. lawmakers, job advertisements, and interviews with gamblers and former employees, documented a striking disparity: Flutter Entertainment voluntarily implemented robust consumer protection measures for its U.K. customers that it has not applied to U.S. FanDuel users.[38] In the U.K.: (a) Flutter introduced a £10-per-spin cap on online slot games in 2021 after its own internal data showed that "customer risk levels may increase more sharply" at higher stakes; (b) Flutter mandates deposit limits for U.K. customers under the age of 25; and (c) Flutter curtailed its U.K. "VIP" program after recognizing escalating harm risks.[39] In the U.S. during the relevant period: FanDuel permitted spins up to $800 with no equivalent age-based stake restrictions, applied no mandatory deposit limits for users under 25, and operated a VIP program

---

[37] Quintero Garzola GC, Vaccarino A. *Microbetting, Fantasy Sports and Risk of Gambling Disorder: A Scoping Review*. 40 J. Gambling Stud. 587-600 (2024) (PubMED PMID: 37452978), https://pubmed.ncbi.nlm.nih.gov/37452978/ (last visited Mar. 25, 2026).
[38] Reuters, *Online-Gambling Giants Conquer U.S. with Tactics Deemed Too Tough for Britain* (July 3, 2024), https://www.reuters.com/investigations/online-gambling-giants-conquer-us-with-tactics-deemed-too-tough-britain-2024-07-03/ (last visited Mar. 25, 2026).
[39] *Id.*

with compensation structures tied to "increas[ing] player activity and driv[ing] revenue."[40] Flutter's own CEO acknowledged a "duty to intervene when customers showed signs of problem gambling" following a £2.8 million U.K. regulatory fine in 2018 — yet this duty was not operationalized for FanDuel's U.S. platform.[41] Defendants were on constructive notice throughout the relevant period that their consumer protection measures in the United States were insufficient and likely ineffective.

44. The addictive design of Defendants' sports gambling apps is intentional. Their utilization of user data and user targeting to implement intentionally addictive features has led users, such as Plaintiff MAXWELL OTU, to be sucked into a vicious cycle of gambling addiction that has led to economic losses, mental anguish, and the physical manifestations of that mental anguish.

## PLAINTIFF MAXWELL OTU'S SPECIFIC FACTS

45. Plaintiff MAXWELL OTU placed bets and gambled through FanDuel's mobile applications. While the vast majority of his gambling has been on the FanDuel app, he has since also gambled with BetMGM. He began using the FanDuel applications in 2020.

46. Plaintiff MAXWELL OTU first began using the FanDuel applications for betting on sports events but eventually developed an unmanageable addiction to Defendants' gambling applications.

47. Plaintiff MAXWELL OTU's history of play on FanDuel's apps demonstrates escalation and loss of control, of which FanDuel was all too aware. Since starting to use FanDuel, Plaintiff has wagered over $2,470,000.00 with net losses of approximately $596,000.00.

---

[40] *Id.*
[41] *Id.*

48. Plaintiff MAXWELL OTU's gambling quickly consumed his life.

49. Plaintiff MAXWELL OTU frequently communicated with the "VIP" account manager, who has offered him promotions, free bets, and bonuses to lure Plaintiff back into using the app.

50. Plaintiff MAXWELL OUT's gambling addiction and daily use of the FanDuel app has led him to suffer significant financial struggles.

51. Plaintiff MAXWELL OTU has struggled to pay rent, and he las been forced to sell vehicles to maintain his finances and professional life.

52. Plaintiff MAXWELL OTU's financial struggles have in turn caused significant disruption in sleep because of his loss of funds due to gambling.

53. Plaintiff MAXWELL OUT has also faced significant emotional strain as a result of gambling addiction impacting his ability to maintain relationships.

54. Plaintiff MAXWELL OTU now struggles with anxiety, depression, and hopelessness because of Plaintiff's addiction to gambling and the subsequent loss of funds.

55. As a result of his addiction to the Defendants' gambling platforms, Plaintiff MAXWELL OTU has experienced physical and mental health problems including gambling addiction, anxiety and depression, negative effects to his relationships and loss of funds far more than his income. These facts at all times relevant were known to the Defendants, who encouraged the Plaintiff to gamble more often, and at higher levels.

**COUNT I**
**BREACH OF WARRANTY – DEFECTIVE DESIGN**
**Against All Defendants**

56. Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs, as though fully set forth herein.

57. At all relevant times, Defendants designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, supplied, distributed and benefited from their products used by Plaintiff.

58. Defendant's apps and platforms are designed and intended to be utilized as online sports betting products.

59. Defendants' products are distributed and made available to the public through the Defendant's mobile applications.

60. Defendants' products are marketed and advertised to the public for the personal use of the end-user/consumer.

61. Defendants, as the designers, developers, managers, operators, testers, producers, labelers, marketers, advertisers, promoters, controllers, suppliers, distributors, and benefiters of their products, impliedly warranted that such products were merchantable and fit for the ordinary purposes for which they were intended.

62. Defendants breached this warranty because the online sport betting products they designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, supplied, distributed, and benefited from were defective and unreasonably dangerous to users and consumers, including Plaintiff.

63. Defendants defectively designed their products to addict all users of their sports gambling apps.

64. Defendants' apps are unreasonably dangerous as designed and rely on product features that are unreasonably dangerous and addictive.

65. Plaintiff used these products in a manner in which Defendants intended and expected them to be used, and Defendants knew, or by the exercise of reasonable care, should have

known, that Plaintiff would use these products without inspection for or knowledge of their addictive nature.

66. Defendants' products are defective in design and pose a substantial likelihood of harm for the reasons set forth herein, because the products fail to meet the safety expectations of ordinary consumers when used in an intended or reasonably foreseeable manner, and because the products are less safe than an ordinary consumer would expect when used in such a manner.

67. Plaintiff, as the consumer of Defendants' products, did not expect the products to be psychologically and neurologically addictive, far beyond that which might be expected from non-online gambling and/or non-online sports betting when the products are used in their intended manner by their intended audiences.

68. Plaintiff, as the consumer of Defendants' products, did not expect the algorithms and other features embedded by Defendants in their products to make them initially and progressively more stimulative, to maximize the consumers' usage time and spending on online sports betting.

69. Plaintiff, as the consumer of Defendants' products, did not expect each Defendant's revenues and profits to be directly tied to the strength of these addictive mechanisms.

70. Defendants' products are likewise defectively designed in that they create an inherent risk of danger; specifically, a risk of abuse, addiction, and compulsive use beyond that which might be expected from non-online gambling and/or non-online sports betting, which can lead to numerous harms including but not limited to gambling losses, eviction or foreclosure, bankruptcy, stress, family breakup and career loss, mental anguish, and physical harm.

71. The risks inherent in the design of Defendants' products significantly outweigh any benefit of such design.

72. Each of the Defendants could have utilized cost-effective, reasonably feasible alternative designs including algorithmic changes and changes to the addictive features described above, to minimize the harms described herein, including, but not limited to:

a. Default protective limits to the amounts spent on sports betting and/or the amount of time spent on the site;
b. Opt-in restrictions to the amount spent on sports betting and/or the amount of time spent on the site;
c. Self-limiting tools, including but not limited to sports betting amount and/or time spent notifications, warnings or reports;
d. Blocks to use during certain times of day;
e. Redesigning algorithms to limit rather than promote addictive engagement;
f. Eliminating the use of "push" notifications to draw users back to the apps;
g. Limits on the strategic timing and clustering of notifications to lure back users;
h. Removing barriers to the deactivation and deletion of accounts;
i. Limit or eliminating artificial intelligence to track individual player's gambling habits;
j. Eliminating the offering of "VIP" managers and personalized betting incentives;
k. Limit or eliminating the use of artificial intelligence to create individualized offers and promotions to customers—especially in the near aftermath of large losses;
l. Limit or eliminating the use of microbets and prop bets that lead to accelerated, uncontrolled gambling; and
m. Limit or prohibiting one or more advertisements to induce gambling with phrases such as "bonus," "no sweat," "risk free," odds boosts, or similar promotions.

73. Alternative designs were available that would reduce users' addictive and compulsive engagement with each of the Defendants' products, and which would have effectively served the same purpose of Defendants' products while reducing the gravity and severity of danger posed by those products' defects.

74. Plaintiff used Defendants' products as intended or in reasonably foreseeable ways.\

75. As a direct and proximate result of each of the Defendants' conduct and defectively designed product, Plaintiff developed a gambling addiction disorder and suffered physical harm,

mental anguish, stress, and economic losses from online sports betting and related economic losses arising therefrom.

## COUNT II
## BREACH OF WARRANTY – FAILURE TO WARN

**Against All Defendants**

76. Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs, as though fully set forth herein.

77. Defendants' sports betting apps are unreasonably dangerous as designed and rely on product features that are unreasonably dangerous.

78. At all relevant times, each Defendant designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, supplied, distributed and benefitted from its products used by Plaintiff.

79. Plaintiff was a foreseeable user of Defendants' products.

80. Defendants' products are distributed to the public through the Defendants' sports gambling applications.

81. Defendants distributed and made their platforms available to Plaintiff in a defective and unreasonably dangerous condition by failing to adequately warn about the risk of harm to its users, as described herein, including risk of addiction and compulsive use which can lead to numerous harms including gambling losses, eviction or foreclosure, bankruptcy, stress, career loss, family breakup, and physical and mental impacts, such as depression, anxiety, and irritability.

82. Defendants' products are dangerous in that they create an inherent risk of danger; specifically, a risk of abuse, addiction, and compulsive use beyond that which might be expected from non-online gambling and/or non-online sports betting, which can lead to numerous harms including but not limited to gambling losses, eviction or foreclosure, bankruptcy, stress, family

breakup, loss of career, mental anguish including depression and anxiety, and the physical manifestations of that mental anguish.

83. Defendants knew or, by the exercise of reasonable care, should have known that their products posed risks of harm to their users considering their own internal data and knowledge regarding their products at the time of development, design, marketing, promotion, advertising, and distribution.

84. Defendants knew or, by the exercise of reasonable care, should have known that their products posed risks of harm to each particular user based on Defendants' personalized data collection specific to Plaintiff, including but not limited to Plaintiff's gambling habits, time spent on their apps, Plaintiff's significant losses, Plaintiff's high number of bets placed, and Plaintiff's use of his "VIP" manager.

85. Defendants' products are defective and unreasonably dangerous because, among other reasons described herein, each Defendant failed to exercise reasonable care to inform users that, among other things:

a. Defendants' products cause addiction, compulsive use, and/or other concomitant physical and mental injuries and emotional distress;
b. Defendants' products harvest and utilize data in such a way that increases a user's risk of addiction to these products and concomitant physical and mental injuries and emotional distress;
c. The algorithmically-targeted advertisements and contact with the Plaintiff by Defendants are designed to encourage compulsive sports betting and use of the products and to discourage the Plaintiff from reducing, pausing and/or ceasing online sports betting by and through the product, thus raising the risk of harms including gambling losses and related economic losses;
d. The use of "VIP" managers providing personalized incentives to Plaintiff would further his gambling addiction by constantly luring him in to placing additional, larger bets;
e. The likelihood and intensity of these harmful effects is exacerbated by the interaction of each product's features with

one another, and by algorithms and other source code design that is currently publicly unknown and unavailable for review and inspection by users and governmental entities.

86. Ordinary users, such as Plaintiff, would not have recognized the potential risks of Defendants' products when used in a manner reasonably foreseeable to each of the Defendants.

87. Had Plaintiff received proper or adequate warnings or instructions as to the risks of using Defendants' products, Plaintiff would have heeded the warnings and/or instructions.

88. Each Defendants' failure to adequately warn Plaintiff about the risks of its defective products was a proximate cause and a substantial factor in the injuries sustained by Plaintiff.

89. As a direct and proximate result of Defendants' conduct and failure to warn of the unreasonable risks of its products, Plaintiff suffered physical harm, mental anguish, stress, facing of foreclosure, and further related economic losses arising therefrom due to online sports betting on Defendants' platforms.

## COUNT III
## NEGLIGENT DESIGN

**Against All Defendants**

90. Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs, as though fully set forth herein.

91. At all relevant times, Defendants were engaged in the business of designing online sports betting apps.

92. At all relevant times, the Defendants had a duty to exercise reasonable care to carefully and properly design their products to be reasonably safe online sports betting apps.

93. Defendants breached that duty because the online sports betting apps that they designed were unreasonably dangerous and defective for the reasons described above.

94. Because of the Defendants' failure to properly design their online sports betting apps, those products were placed on the market and distributed to Plaintiff while they were in an unreasonably dangerous and defective condition.

95. Plaintiff downloaded and used the online sports betting apps, which were in an unreasonably dangerous and defective condition at the time of purchase, in a reasonably foreseeable manner and substantially as intended by the Defendants.

96. Defendants knew or by an exercise of reasonable care should have known their products would create addiction, financial collapse, physical harm, and mental anguish.

97. Defendants knew or by an exercise of reasonable care should have known their products would not generate long-term, healthy users, but would instead extract short-term value, especially from individuals at moments of optimized emotional and cognitive vulnerability.

98. As a direct and proximate result, Plaintiff suffered the injuries described above.

99. It was foreseeable that consumers like Plaintiff who used Defendants' online sports betting apps would, as a direct and proximate result, suffer those injuries.

100. In light of what they knew or should have known, Defendants should have anticipated that these injuries were a likely result of the actions and failures to act described above.

101. Through these actions and inactions, Defendants knowingly risked the financial wellbeing and mental and physical health of unsuspecting consumers, including Plaintiff, in order to continue making a profit.

## COUNT IV
## NEGLIGENT FAILURE TO WARN

**Against All Defendants**

102. Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs, as though fully set forth herein.

103. At all relevant times, each Defendant designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, supplied, distributed and benefitted from its products used by Plaintiff.

104. Plaintiff was a foreseeable user of Defendants' products.

105. At all relevant times, Defendants had a duty to exercise reasonable care to carefully and properly warn Plaintiff and the general public about the reasonably foreseeable risks and dangers of their products.

106. Defendants knew, or by the exercise of reasonable care, should have known, that use of their products was dangerous, harmful, addictive, and injurious when used in a reasonably foreseeable manner.

107. Because of Defendants' failure to properly design their online sports betting apps, those products were placed on the market and distributed to Plaintiff while they were in an unreasonably dangerous and defective condition.

108. Plaintiff downloaded and used the online sports betting apps, which were in an unreasonably dangerous and defective condition at the time of download, in a reasonably foreseeable manner and as intended by the Defendants.

109. Defendants offered no warnings to Plaintiff nor to the public of the addictive nature of their sports betting platforms despite their knowledge and utilization of the very features that make their apps addictive.

110. As a direct and proximate result, Plaintiff suffered the injuries described above.

111. It was foreseeable that consumers like Plaintiff who used Defendants' online sports betting apps would, as a direct and proximate result, suffer those injuries.

112. In light of what they knew or should have known, the Defendants should have anticipated that these injuries were a likely result of the actions and failures to act described above.

113. A reasonable company under the same or similar circumstances as Defendants would have provided adequate warnings to the consumers of their products.

114. Defendants could have provided adequate warnings and safeguards to consumers, such as Plaintiff, which would have prevented the harms alleged herein.

## COUNT V
## NEGLIGENCE

**Against All Defendants**

115. Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs, as though fully set forth herein.

116. At all relevant times, each Defendant designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, supplied, distributed and benefitted from its products used by Plaintiff.

117. Plaintiff was a foreseeable user of Defendants' products.

118. At all relevant times, the Defendants had a duty to exercise reasonable care in the design, development, management, operation, testing, production, labeling, marketing, advertising, promotion, control, sales and distribution of their products.

119. Defendants knew or should have known that their products were dangerous, harmful, addictive, and injurious to their users when used in a reasonably foreseeable manner.

120. Defendants intentionally used targeted advertising, personalized "bonus" incentives, push notifications, and other features as discussed and explained above to prey on addicted gamblers or to hook recreational gamblers into a pattern of addiction.

121. Defendants knew or should have known their users, including Plaintiff, would not have realized the potential risks and dangers of using their sports gambling apps, including a risk of addiction, and compulsive betting, not present with other forms of gambling and/or offline sports betting.

122. Defendants could have avoided Plaintiff's injuries with minimal cost, including, for example, by not including or reconfiguring certain features and algorithms in their sports betting apps which harmed Plaintiff.

123. Each Defendant has breached its duties of care owed to Plaintiff through its actions, misdeeds, omissions and negligence in the design, development, management, operation, testing, production, labeling, marketing, advertising, promotion, control, sales and distribution of its products.

124. The breaches of duty by each Defendant include, but are not necessarily limited to the following:

a. Including features and algorithms in their online sports betting platforms that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of compulsive gambling and/or gambling addiction and related financial losses and other harms as discussed above;
b. Marketing and advertising to users, potential new customers, and customers that want to stop using their product both through the product itself and in general through television, internet and other media advertising;
c. Maintaining unreasonably dangerous features and algorithms in their platforms after notice that such features and algorithms, as structured and operated, posed a foreseeable risk of harm to the financial, mental, emotional and physical health of its users; and
d. Utilizing "VIP" managers to offer personalized betting incentives to high volume, heavily addicted gamblers;
e. Failing to implement reasonably available means to monitor for and limit or deter excessive gambling, including patterns, frequency, or duration of use that are indicative of addiction, compulsive gambling, or excessive gambling.

125. A reasonable company under the same or similar circumstances as each Defendant would have designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, supplied, distributed and benefitted from its online sports betting platform in a manner that is safer for and more protective of its users.

126. As a direct and proximate result, Plaintiff suffered the injuries described above.

127. It was foreseeable that persons like Plaintiff who used Defendants' sports gambling apps would, as a direct and proximate result, suffer those injuries.

128. In light of what they knew or should have known, Defendants should have anticipated that these injuries were a likely result of the actions and failures to act described above.

## COUNT VI
## INTENTIONAL MISREPRESENTATION
**Against All Defendants**

129. Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs, as though fully set forth herein.

130. As set forth in more detail above, Defendants knew about the defective condition of their sports gambling apps and the serious risks they posed to its users, including Plaintiff.

131. Defendants were under a duty to tell the public the truth and to disclose the defective condition of their addictive sports gambling apps and the serious risks they posed to users, including Plaintiff.

132. Defendants breached their duty to the public and the users of their products, including Plaintiff, by concealing, failing to disclose and making misstatements about the serious risks and addictive nature presented by their sports gambling platforms.

133. Even though Defendants knew of these risks, they intentionally concealed this information to avoid losing users and to continue to gain and addict new users.

134. By intentionally concealing and failing to disclose inherent defects in the design of their sports gambling apps, Defendants knowingly and recklessly misled the public and the users of their products, including Plaintiff, into believing that the products were not designed to addict customers to the point of bankruptcy, financial ruin and subsequent mental anguish among other injuries.

135. Defendants knew that their concealment, misstatements, and omissions were material. A reasonable person, including Plaintiff, would find information that Defendants' sports gambling apps were programmed and designed to negatively impact the users' mental capacity to gamble reasonably and diminish their ability to avoid addictive gambling to be important when deciding whether to use, or continue to use, the product.

136. Plaintiff was unaware of the dangerous and addictive nature of Defendants' sports gambling platforms and was reasonable in his failure to discover them, as they were intentionally concealed by Defendants.

137. As a direct and proximate result of Defendants' material omissions, misrepresentations, and concealment of material information, Plaintiff sustained serious physical harm, including the development of a gambling addiction disorder, pain and suffering, emotional anguish, facing of foreclosure, and other losses for which Plaintiff is entitled to recover the damages sought in this Complaint.

## COUNT VII
## UNJUST ENRICHMENT

**Against All Defendants**

138. Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs, as though fully set forth herein.

139. As an expected and intended result of their conscious wrongdoing as set forth in this Complaint, Defendants have profited off intentionally addicting users of their platforms and have benefitted from the money made from these users, including Plaintiff. Plaintiff would not have lost the amounts alleged herein had it not been for Defendants' deceptive and unfair conduct.

140. Defendants' retention of those payments is unjust, for among other reasons, Plaintiff did not receive the promised or represented functionality, safety, or utility when Plaintiff utilized Defendants' sports gambling apps.

141. It would be inequitable and unjust to allow Defendants to retain the value Plaintiff paid in conjunction with the use of the defective product.

## COUNT VIII
## PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (73 P.S. §§ 201 *ET SEQ.*)

**Against All Defendants**

142. Plaintiff incorporates all the allegations set forth above herein.

143. Plaintiff purchased goods and/or services from FanDuel for Plaintiff's personal use when Plaintiff downloaded and placed bets through the FanDuel Sportsbook/Casino Apps.

144. Defendants engaged in unfair and deceptive conduct by intentionally designing their Sportsbook/Casino Apps and or individual product features to encourage, develop, or increase compulsive and addicting gambling behavior of their users through their apps and features, including through (i) not imposing self-limiting tools, (ii) utilizing timely and persistent promotions, and (iii) using artificial intelligence to track user gambling habits to increase use of the apps, amongst other features that were designed and implemented to increase user engagement.

145. Defendants' unfair and deceptive conduct also created the likelihood that Plaintiff would not reasonably be able to understand the risk of compulsive gambling that could result in

addiction through exposure to the apps, and Defendants features were designed to create this exact user exposure.

146. Plaintiff justifiably relied on Defendants to not create and implement their Apps with features that would result in a sports betting product that could cause Plaintiff to become addicted and suffer loss and injuries.

147. Plaintiff also justifiably relied on Defendants to not unreasonably expose him to the possibility of addiction through the Apps' features, such as the constant streams of personalized betting opportunities, frequent notifications, and or promotional offers that increased Plaintiff's exposure to the Apps, the number of bets Plaintiff made, the risk that Plaintiff would become addicted, and the amount of financial loss and harm that could and did follow.

148. Defendants' unfair and deceptive trade practices and conduct were a direct and proximate cause of and a substantial factor in the physical harm that Plaintiff suffered, including his gambling addiction, depression, anxiety, and related symptoms.

149. Additionally, Defendants' unfair and deceptive practices and conduct were a direct and proximate cause and substantial factor in Plaintiff suffering ascertainable financial loss from the repeated and addictive betting through the Sportsbook/Casino Apps. But for the Defendants' unfair and deceptive practices and conduct, Plaintiff would not have bet as frequently on the Sportsbook/Casino Apps, and therefore would not have suffered the resulting and current financial loss.

## EQUITABLE TOLLING OF STATUTE OF LIMITATIONS

150. Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs, as though fully set forth herein.

151. Defendants willfully, wantonly, and intentionally withheld information from Plaintiff and the general public concerning the known dangers associated with the use of their sports gambling apps. Due to the absence of any warning by the Defendants as to the significant addiction risk associated with their sports gambling products, Plaintiff was unaware that his use of the platforms would lead to his addiction and further economic and mental injuries.

152. To the extent that Defendant(s) may claim that one or more of Plaintiff's claims are barred by the applicable statute of limitations, Plaintiff asserts that the statute of limitations is and has been tolled by Plaintiff's discovery that the injuries were caused by Defendants' defective products and failure to properly and adequately warn of the products' risks, all as more fully set forth in this Complaint, after the injuries sustained by Plaintiff.

## PRAYER FOR RELIEF

153. WHEREFORE, Plaintiff requests judgment against Defendants for compensatory damages for all injuries and losses recoverable under law, including but not limited to:

a. MAXWELL OTU's gambling losses incurred on the FanDuel apps;

b. MAXWELL OTU's physical harm, including his development of a gambling addiction disorder and additional mental health conditions, suffered as a result of using FanDuel's sports gambling platforms;

c. MAXWELL OTU's pain and suffering;

d. MAXWELL OTU's lost earnings;

e. All recoverable costs of this action; all legally recoverable interest; and

f. Any other relief the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff respectfully demands a trial by jury of all claims so triable.

Dated: July 30, 2026

Respectfully Submitted,

*/s/ Francesca K. Burne*
Francesca K. Burne (P.A. Bar No.: 324523)
**AYLSTOCK, WITKIN, KREIS & OVERHOLTZ PLC**
17 E. Main Street, Suite 200
Pensacola, FL 32502
Telephone: (850) 202-1010
Email: fburne@awkolaw.com

Jennifer M. Hoekstra
*pro hac vice forthcoming*
W. Eric Stracener
*pro hac vice forthcoming*
**AYLSTOCK, WITKIN, KREIS & OVERHOLTZ PLC**
17 E. Main Street, Suite 200
Pensacola, FL 32502
Telephone: (850) 202-1010
Email: jhoekstra@awkolaw.com
estracener@awkolaw.com

*Attorneys for Plaintiff*



FILED
07-30-2026 04:37 PM
OFFICE OF JUDICIAL SUPPORT
DELAWARE COUNTY, PA

# Supreme Court of Pennsylvania

Court of Common Pleas
Civil Cover Sheet
DELAWARE County

| For Prothonotary Use Only: | TIME STAMP |
|---|---|
| Docket No: | |

The information collected on this form is used solely for court administration purposes. This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.

## SECTION A

Commencement of Action:
- [x] Complaint
- [ ] Writ of Summons
- [ ] Petition
- [ ] Transfer from Another Jurisdiction
- [ ] Declaration of Taking

| Lead Plaintiff's Name: | Lead Defendant's Name: |
|---|---|
| MAXWELL OTU | FLUTTER ENTERTAINMENT, PLC |
| Are money damages requested? [x] Yes [ ] No | Dollar Amount Requested: (check one) [ ] within arbitration limits [x] outside arbitration limits |
| Is this a Class Action Suit? [ ] Yes [x] No | Is this an MDJ Appeal? [ ] Yes [x] No |

Name of Plaintiff/Appellant's Attorney: Francesca K. Burne

- [ ] Check here if you have no attorney (are a Self-Represented [Pro Se] Litigant)

## SECTION B

Nature of the Case: Place an "X" to the left of the ONE case category that most accurately describes your PRIMARY CASE. If you are making more than one type of claim, check the one that you consider most important.

**TORT** (do not include Mass Tort)
- [ ] Intentional
- [ ] Malicious Prosecution
- [ ] Motor Vehicle
- [ ] Nuisance
- [ ] Premises Liability
- [x] Product Liability (does not include mass tort)
- [ ] Slander/Libel/ Defamation
- [ ] Other:

**MASS TORT**
- [ ] Asbestos
- [ ] Tobacco
- [ ] Toxic Tort - DES
- [ ] Toxic Tort - Implant
- [ ] Toxic Waste
- [ ] Other:

**PROFESSIONAL LIABLITY**
- [ ] Dental
- [ ] Legal
- [ ] Medical
- [ ] Other Professional:

**CONTRACT** (do not include Judgments)
- [ ] Buyer Plaintiff
- [ ] Debt Collection: Credit Card
- [ ] Debt Collection: Other
- [ ] Employment Dispute: Discrimination
- [ ] Employment Dispute: Other
- [ ] Other:

**REAL PROPERTY**
- [ ] Ejectment
- [ ] Eminent Domain/Condemnation
- [ ] Ground Rent
- [ ] Landlord/Tenant Dispute
- [ ] Mortgage Foreclosure: Residential
- [ ] Mortgage Foreclosure: Commercial
- [ ] Partition
- [ ] Quiet Title
- [ ] Other:

**CIVIL APPEALS**

Administrative Agencies
- [ ] Board of Assessment
- [ ] Board of Elections
- [ ] Dept. of Transportation
- [ ] Statutory Appeal: Other
- [ ] Zoning Board
- [ ] Other:

**MISCELLANEOUS**
- [ ] Common Law/Statutory Arbitration
- [ ] Declaratory Judgment
- [ ] Mandamus
- [ ] Non-Domestic Relations Restraining Order
- [ ] Quo Warranto
- [ ] Replevin
- [ ] Other:

# NOTICE

**Pennsylvania Rule of Civil Procedure 205.5. (Cover Sheet) provides, in part:**

**Rule 205.5. Cover Sheet**

(a)(1) This rule shall apply to all actions governed by the rules of civil procedure except the following:

(i) actions pursuant to the Protection from Abuse Act, Rules 1901 et seq.

(ii) actions for support, Rules 1910.1 et seq.

(iii) actions for custody, partial custody and visitation of minor children, Rules 1915.1 et seq.

(iv) actions for divorce or annulment of marriage, Rules 1920.1 et seq.

(v) actions in domestic relations generally, including paternity actions, Rules 1930.1 et seq.

(vi) voluntary mediation in custody actions, Rules 1940.1 et seq.

(2) At the commencement of any action, the party initiating the action shall complete the cover sheet set forth in subdivision (e) and file it with the prothonotary.

(b) The prothonotary shall not accept a filing commencing an action without a completed cover sheet.

(c) The prothonotary shall assist a party appearing pro se in the completion of the form.

(d) A judicial district which has implemented an electronic filing system pursuant to Rule 205.4 and has promulgated those procedures pursuant to Rule 239.9 shall be exempt from the provisions of this rule.

(e) The Court Administrator of Pennsylvania, in conjunction with the Civil Procedural Rules Committee, shall design and publish the cover sheet. The latest version of the form shall be published on the website of the Administrative Office of Pennsylvania Courts at www.pacourts.us.

FILED
07-30-2026 04:37 PM
OFFICE OF JUDICIAL SUPPORT
DELAWARE COUNTY, PA

**IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA**

| | |
|---|---|
| MAXWELL OTU,<br>Plaintiff,<br>v.<br>FLUTTER ENTERTAINMENT, PLC., *et al.*,<br>Defendants. | CIVIL DIVISION<br>CASE NO: CV-2026-006983 |

**STIPULATION**

AND NOW, this _____ day of _____________ 2026, Plaintiff, Maxwell Otu, and Defendants Flutter Entertainment plc, FanDuel Group Parent LLC, Betfair Interactive US LLC, FanDuel PA LLC, FanDuel Inc. ("Defendants" and together with Plaintiff, the "Parties"), hereby jointly stipulate to and respectfully request that the Court adopt the following responsive pleading schedule.

1. Plaintiff filed his Complaint on July 30, 2026.
2. Defendants accepted service of the Complaint on August 21, 2026.
3. The Parties agree and respectfully request that the deadline for Defendants to respond to Plaintiff's Complaint be extended to **October 30, 2026.**
4. To the extent that any Defendants' initial responsive pleading is a Motion, Petition, or Preliminary Objections rather than an Answer, the Parties agree and respectfully request that the deadline for Plaintiff to file any opposition be extended to **December 9, 2026** and that the deadline for Defendants to file any reply will be **January 7, 2027**.
5. Nothing in this Stipulation shall constitute a waiver of, or prejudice to, any rights, defenses, objections, or arguments available to any party, all of which are expressly preserved.

It is so Stipulated and Agreed by the Parties:

Dated: September 4, 2026

AYLSTOCK, WITKIN, KREIS
& OVERHOLTZ PLC

*/s/ Francesca K. Burne*
Francesca K. Burne (PA ID No. 324523)
Jennifer M. Hoekstra*
W. Eric Stracener*
17 E. Main Street, Suite 200
Pensacola, FL 32502
Telephone: (850) 202-1010
fburne@awkolaw.com
jhoekstra@awkolaw.com
estracener@awkolaw.com

**pro hac vice* motions forthcoming

*Attorneys for Plaintiff, Maxwell Otu*

SHOOK, HARDY & BACON L.L.P.

/s/*Erin L. Leffler*
Erin L. Leffler (PA ID No. 204507)
Two Commerce Square
2001 Market Street, Suite 3000
Philadelphia, PA 19103
Telephone: (215) 278-2555
eleffler@shb.com

COVINGTON & BURLING L.L.P.
Andrew Stanner*
Gary M. Rubman*
Amber Charles*
One CityCenter
850 Tenth Street NW
Washington, D.C. 20001
Telephone: (202) 662-6000
astanner@cov.com
grubman@cov.com
acharles@cov.com

**pro hac vice* motions forthcoming

*Attorney for Defendants, Flutter Entertainment plc, FanDuel Group Parent LLC, Betfair Interactive US LLC, FanDuel PA LLC, and FanDuel, Inc.*

IT IS SO ORDERED this ______ day of ___________________________, 2026.

**BY THE COURT:**

____________________________________
J.

**CERTIFICATE OF SERVICE**

I, Erin L. Leffler, hereby certify that on September 4, 2026, I served a true and correct copy of the foregoing Stipulation via the Court's e-filing system and electronic mail as follows:

Francesca K. Burne
Jennifer M. Hoekstra
W. Eric Stracener
Aylstock, Witkin, Kreis & Overholtz PLC
17 E. Main Street, Suite 200
Pensacola, FL 32502
fburne@awkolaw.com
jhoekstra@awkolaw.com
estracener@awkolaw.com
*Attorneys for Plaintiff*

By: */s/ Erin L. Leffler*
Erin L. Leffler

*Attorney for Defendants Flutter Entertainment plc, FanDuel Group Parent LLC, Betfair Interactive US LLC, FanDuel PA LLC, and FanDuel Inc.*

FILED
09-04-2026 09:03 PM
OFFICE OF JUDICIAL SUPPORT
DELAWARE COUNTY, PA

**SHOOK, HARDY & BACON L.L.P.**
BY: Erin L. Leffler (PA ID No. 204507)
Two Commerce Square
2001 Market Street, Suite 3000
Philadelphia, PA 19103
(215) 278-2555
eleffler@shb.com

**IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA**

| | |
|---|---|
| MAXWELL OTU,<br><br>Plaintiff,<br><br>v.<br><br>FLUTTER ENTERTAINMENT, PLC., *et al.*,<br><br>Defendants. | CIVIL DIVISION<br><br>CASE NO: CV-2026-006983 |

**ENTRY OF APPEARANCE**

**TO THE PROTHONOTARY:**

Kindly enter the appearance of Erin L. Leffler (PA Bar No. 204507) on behalf of Defendants Flutter Entertainment plc, FanDuel Group Parent LLC, Betfair Interactive US LLC, FanDuel PA LLC, FanDuel Inc.,[1] in the above-captioned action.

Respectfully submitted,

**SHOOK, HARDY & BACON L.L.P.**

Dated: September 4, 2026

By: */s/ Erin L. Leffler*
Erin L. Leffler
*Defendants, Flutter Entertainment plc, FanDuel Group Parent LLC, Betfair Interactive US LLC, FanDuel PA LLC, and FanDuel, Inc.*

[1] By filing this acceptance of service, Defendants do not concede that the proper entities have been named or that each Defendant is subject to the personal jurisdiction of this Court and reserve the right to move for dismissal on this or any other grounds.

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on September 4, 2026, I caused a true and correct copy of the foregoing Entry of Appearance to be served via the Court's e filing system and electronic mail as follows:

Francesca K. Burne
Jennifer M. Hoekstra
W. Eric Stracener
Aylstock, Witkin, Kreis & Overholtz PLC
17 E. Main Street, Suite 200
Pensacola, FL 32502
fburne@awkolaw.com
jhoekstra@awkolaw.com
estracener@awkolaw.com
*Attorneys for Plaintiff*

By: */s/ Erin L. Leffler*
Erin L. Leffler

*Attorney for Defendants Flutter Entertainment plc, FanDuel Group Parent LLC, Betfair Interactive US LLC, FanDuel PA LLC, and FanDuel Inc.*

FILED
09-08-2026 03:37 PM
OFFICE OF JUDICIAL SUPPORT
DELAWARE COUNTY, PA

**IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA**

| | |
|---|---|
| MAXWELL OTU,<br>Plaintiff,<br>v.<br>FLUTTER ENTERTAINMENT, PLC., *et al.*,<br>Defendants. | CIVIL DIVISION<br>CASE NO: CV-2026-006983 |

**STIPULATION**

AND NOW, this _____ day of _____________ 2026, Plaintiff, Maxwell Otu, and Defendants Flutter Entertainment plc, FanDuel Group Parent LLC, Betfair Interactive US LLC, FanDuel PA LLC, FanDuel Inc. ("Defendants" and together with Plaintiff, the "Parties"), hereby jointly stipulate to and respectfully request that the Court adopt the following responsive pleading schedule.

1. Plaintiff filed his Complaint on July 30, 2026.
2. Defendants accepted service of the Complaint on August 21, 2026.
3. The Parties agree and respectfully request that the deadline for Defendants to respond to Plaintiff's Complaint be extended to **October 30, 2026.**
4. To the extent that any Defendants' initial responsive pleading is a Motion, Petition, or Preliminary Objections rather than an Answer, the Parties agree and respectfully request that the deadline for Plaintiff to file any opposition be extended to **December 9, 2026** and that the deadline for Defendants to file any reply will be **January 7, 2027**.
5. Nothing in this Stipulation shall constitute a waiver of, or prejudice to, any rights, defenses, objections, or arguments available to any party, all of which are expressly preserved.

It is so Stipulated and Agreed by the Parties:

Dated: September 4, 2026

AYLSTOCK, WITKIN, KREIS
& OVERHOLTZ PLC

*/s/ Francesca K. Burne*
Francesca K. Burne (PA ID No. 324523)
Jennifer M. Hoekstra*
W. Eric Stracener*
17 E. Main Street, Suite 200
Pensacola, FL 32502
Telephone: (850) 202-1010
fburne@awkolaw.com
jhoekstra@awkolaw.com
estracener@awkolaw.com

**pro hac vice* motions forthcoming

*Attorneys for Plaintiff, Maxwell Otu*

SHOOK, HARDY & BACON L.L.P.

/s/*Erin L. Leffler*
Erin L. Leffler (PA ID No. 204507)
Two Commerce Square
2001 Market Street, Suite 3000
Philadelphia, PA 19103
Telephone: (215) 278-2555
eleffler@shb.com

COVINGTON & BURLING L.L.P.
Andrew Stanner*
Gary M. Rubman*
Amber Charles*
One CityCenter
850 Tenth Street NW
Washington, D.C. 20001
Telephone: (202) 662-6000
astanner@cov.com
grubman@cov.com
acharles@cov.com

**pro hac vice* motions forthcoming

*Attorney for Defendants, Flutter Entertainment plc, FanDuel Group Parent LLC, Betfair Interactive US LLC, FanDuel PA LLC, and FanDuel, Inc.*

IT IS SO ORDERED this ______ day of ___________________________, 2026.

**BY THE COURT:**

____________________________________
J.

**CERTIFICATE OF SERVICE**

I, Erin L. Leffler, hereby certify that on September 4, 2026, I served a true and correct copy of the foregoing Stipulation via the Court's e-filing system and electronic mail as follows:

Francesca K. Burne
Jennifer M. Hoekstra
W. Eric Stracener
Aylstock, Witkin, Kreis & Overholtz PLC
17 E. Main Street, Suite 200
Pensacola, FL 32502
fburne@awkolaw.com
jhoekstra@awkolaw.com
estracener@awkolaw.com
*Attorneys for Plaintiff*

By: */s/ Erin L. Leffler*
Erin L. Leffler

*Attorney for Defendants Flutter Entertainment plc, FanDuel Group Parent LLC, Betfair Interactive US LLC, FanDuel PA LLC, and FanDuel Inc.*

FILED
09-09-2026 12:16 PM
OFFICE OF JUDICIAL SUPPORT
DELAWARE COUNTY, PA

THOMSON REUTERS
C-Track E-Filing

DELAWARE COUNTY, PENNSYLVANIA E-FILING

Erin Loucks Leffle

Case search | Create Filing | Filing Management

Case Information

| | |
|---|---|
| Court | Delaware County Court of Common Pleas |
| Case | CV-2026-006983 |
| Class | Civil - Tort - Product Liability |
| Short Title | OTU v. FLUTTER ENTERTAINMENT, PLC et al |
| Status | Active |

CREATE E-FILING

## Case View - CV-2026-006983

CASE INFORMATION

| | | | |
|---|---|---|---|
| Court Level | Court of Common Pleas | Court | Delaware County Court of Common Pleas |
| Case Title | OTU v. FLUTTER ENTERTAINMENT, PLC et al | Case Type | Civil - Tort - Product Liability |
| Filed Date | 07-30-2026 | Status | Active |
| Next Hearing | | Judge | |
| Next Hearing Type | | | |

PARTIES / PARTICIPANTS

| # | Role | Name | Attorney | Service |
|---|---|---|---|---|
| 1 | Plaintiff | OTU, MAXWELL | Burne, Francesca Kester | eServic |
| 1 | Defendant | FLUTTER ENTERTAINMENT, PLC | LOUCKS, ERIN | eServic |
| 2 | Defendant | FANDUEL GROUP PARENT LLC | LOUCKS, ERIN | eServic |
| 3 | Defendant | BETFAIR INTERACTIVE US, LLC | LOUCKS, ERIN | eServic |
| 4 | Defendant | FANDUEL PA LLC | LOUCKS, ERIN | eServic |
| 5 | Defendant | FANDUEL INC. | LOUCKS, ERIN | eServic |

1 to 6 of 6 records

FILTER

DOCKET SHEET

| Filed Date | Document Description | Filed By |
|---|---|---|
| 09-11-2026 | Financials - Receipt | |
| 09-09-2026 | Financials - Receipt | |
| 09-09-2026 | Stipulation - Stipulation and Order | BETFAIR INTERACTIVE US, LLC,<br>FANDUEL GROUP PARENT LLC,<br>FANDUEL INC.,<br>FANDUEL PA LLC,<br>FLUTTER ENTERTAINMENT, PLC |
| 09-09-2026 | Financials - Receipt | |
| 09-08-2026 | Miscellaneous - Entry of Appearance for Defendant | BETFAIR INTERACTIVE US, LLC,<br>FANDUEL GROUP PARENT LLC,<br>FANDUEL INC.,<br>FANDUEL PA LLC,<br>FLUTTER ENTERTAINMENT, PLC |
| 09-04-2026 | Stipulation - Stipulation | BETFAIR INTERACTIVE US, LLC,<br>FANDUEL GROUP PARENT LLC,<br>FANDUEL INC.,<br>FANDUEL PA LLC,<br>FLUTTER ENTERTAINMENT, PLC |
| 07-31-2026 | Financials - Receipt | |
| 07-30-2026 | Commenced by - Complaint | MAXWELL OTU |

1 to 8 of 8 records